FILED
2010 Jul-22  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**VERONICA CAMPBELL,**

    **Plaintiff,**

**v.**                                       **Case No.: 2:09-cv-1566-IPJ**

**SLOSS INDUSTRIES,**

    **Defendant.**

## <u>MEMORANDUM OPINION</u>

Pending before the court is Defendant Sloss Industries' motion for summary judgment (doc. 21), brief in support (doc. 22), evidentiary materials (doc. 23), and two motions to strike (docs. 31-32).  Plaintiff Veronica Campbell filed a response brief (doc. 26) and evidentiary materials (doc. 27), to which the defendant filed a reply (doc. 33) and additional evidentiary materials (doc. 34).

### Factual Background

Plaintiff Veronica Campbell sues her employer, defendant Sloss Industries ("Sloss"), for sexual harassment under a theory of hostile work environment and for retaliation, in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* Campbell began her employment with Sloss Industries on December 19, 2005, when she was hired as a lidman.  Campbell Dep., at 51 (doc. 23-6).  Sloss Industries has a coke

plant in Birmingham, Alabama, where coal is heated for a prescribed length of time to create coke. Castleberry Dep., at 14 (doc. 23-1). Lidmen work in a group that "push" the ovens, remove lids from the oven, and control emissions from the ovens that turn the coal into coke. Castleberry Dep., at 24-26. As a lidman, Campbell asserts that she has been subjected to a hostile work environment due to severe and pervasive sexual harassment. She filed four charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") covering multiple alleged instances of discrimination and retaliation.

June 6, 2007 EEOC Charge

On May 26, 2007, Campbell made a comment to Ulysses Howard that he had "little arms." In response, Howard grabbed a hose and sprayed Campbell in the back and laughed before running to the break room. Although she wanted to retaliate by spraying Howard, another employee identified as "McKinney" convinced her otherwise. A few minutes later, while she was headed to the restroom, Howard grabbed Campbell and pulled her jacket open, telling McKinney, "Look here Kinney[,] her titties aren't big enough for a mouth full." Campbell exclaimed, "What's wrong with you?" and walked away. Howard followed Campbell, and another unidentified male asked Howard, "What's up?" Howard responded by pointing at Campbell and saying, "I'll tell you what's not

up." Campbell told Howard, "I'm not going to elaborate on your ignorance," to which Howard replied, "You don't know who I am." Campbell threatened that Howard would be beaten "black and blue" if he touched her again, and Howard declared, "I'm not scared of you, police, nobody." Ex. 8, Defendant's Evidentiary Material (doc. 23-8).

Campbell waited five days before reporting the event to any supervisor. EEOC Charge (doc. 23-10). An interview of the sole witness Campbell provided Sloss management failed to corroborate any of the events Campbell alleges; the witness stated he never saw Campbell get sprayed nor did he see her jacket get pulled open; he did not hear any of the remarks Howard allegedly said.[1] Sloss management interviewed other personnel working that day, none of whom could corroborate any of the plaintiff's story. Castleberry Dep., at 50-55; Ex. 9, Defendant's Evidentiary Material (doc. 23-9). Nevertheless, Eddie Roberson, the Director of Human Resources for Sloss, offered to change Campbell's shift to an 11:00 p.m. to 7:00 a.m. shift so that she would not have to work with Howard. Campbell turned down the offer because of the shift's late night hours.

---

[1] The court notes that many of the facts are disputed but does not find them material to the resolution of this case. All facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970)

Castelberry Dep., at 65, Campbell Dep., at 94-95.  Campbell filed a charge of

discrimination for these events on June 6, 2007.  EEOC Charge (doc. 23-10).

April 25, 2008 EEOC Charge

The April 25, 2008, charge of discrimination includes events related to a

three-day suspension given to Campbell; a verbal reprimand given to Campbell for

failing to be at her station when required; Greg Smith's increased scrutiny of her

work; and Greg Smith's comments to Campbell that her clothing matched and her

nails were painted.  EEOC Charge (doc. 23-15); Campbell Dep., at 128-130, 157-

176.

On April 1, 2008, Campbell was suspended for three days for missing a

scheduled shift and for not reporting that she would not be working that day.

Record of Disciplinary Action (doc. 23-11).  Under the collective bargaining

agreement to which Campbell is subject, "an employee who fails to show up for a

scheduled shift without reporting off at any time is subject to company

disciplinary policy[,] which during Scott Castleberry's employment as General

Manager at the coke plant[,] has been a three day suspension."  Roberson Aff., ¶10

(doc. 23-2).

Campbell claims that at least three other male employees failed to show up

for a shift and neglected to report off, but they did not receive suspensions.

Campbell Dep., at 166.  Campbell alleges that Rayfield Irvin, Danny Brown, and Melvin Green called to inform her that Derek Albright was not suspended for the same activity.  Campbell Dep., at 163-166; Record of Disciplinary Action (doc. 23-11).  She first stated during her deposition that she assumed Irvin heard about Albright not being suspended from a supervisor.  Campbell Dep., at 164-165.  She later conceded that she did not know how either Irvin or Brown heard about the situation involving Albright; however, she stated that Green told her that a supervisor had told him about Albright not being suspended.[2]  Campbell Dep., at 166. In addition, she "heard that Johnny Chaney had done this also."  (doc. 23-14). Finally, she claims that George Taylor told her that he overlooked the schedule once, but the plaintiff noticed he was at work the following day.  Campbell Dep., at 167.

On April 24, 2008, Campbell filed a grievance with her union because of a verbal reprimand she received on April 23, 2008, for not being at her duty station when required to be there.  Campbell Dep., at 128-130; Grievance Report (doc. 23-13).  The plaintiff stated she was in the proper position but was shielding herself from flames caused by another employee's failure to put lids back on the

---

[2]She explained, "[Green] just called me at home and give [sic] me that information."  Campbell Dep., at 166.

oven with which they were working.  Campbell Dep., at 134; Grievance Report

(doc. 23-13).  She insists that she placed the lids she was responsible for on the

oven within a reasonable amount of time.  Campbell Dep., at 135.  An

investigation by Sloss resulted in findings that Campbell was talking with another

employee away from her station, and her two coworkers did not believe she was

treated differently than other employees.[3]  Castleberry Dep., at 92-93.

Campbell also claims that Greg Smith scrutinizes her work more closely

than the work of male coworkers.  Campbell provided certain examples.  First, she

stated that Greg Smith would "peek" into the break room and say, "I was just

wondering where you were. The first horn has gone off.  You need to be getting

--------

[3]Anthony Smith, an employee working with Campbell at the time, said, "[I]f
one person is not there when the boots come up, we automatically [push lids on]
for them. . . .  I did put hers on that day. I wasn't paying attention if she was
coming or not [to her station].  She was not under the cab[,where her station
was]."  Interview Notes (doc. 23-14).  George Taylor, another employee working
with Campbell that day, stated that they had to wait for her to return to her station
"off and on."  Interview Notes (doc. 23-14).  Finally, Greg Smith, the supervisor
who gave the verbal reprimand to Campbell, stated that he saw Anthony Smith
performing Campbell's duties that day because she was still in another area of the
factory known as the Top House when the first horn sounded.  Interview Notes
(doc. 23-14).  The first horn informs workers known as "pusher operators" to
begin their duties.  The second horn, which comes shortly after the first, informs
the lidmen that they need to be at the "larry car" and prepare to push lids on the
oven. Castleberry Dep., at 40-41.  Because of the sequential nature of the ovens
and larrycar operation, the lidmen know that when they hear the first horn, their
work will commence shortly.  Castleberry Dep., at 40-41.

up." (doc. 23-14).  Second, she claims that he told everyone not to help her with her duties even though she and her coworkers generally worked as a team.[4]  Third, she said that although it was her responsibility to have a pole with her to help her put lids on the oven, if she did not have one, Greg Smith would give her one that was sometimes heavier than the one she would pick out for herself.  Campbell Dep., at 169-178.  She stated "with [her] being a woman . . . it was easier on [her] body" to use a smaller pole; she told Greg Smith he would not treat his wife the same way.  Campbell Dep., at 170, 176.  In the grievance she filed on April 24, 2008, she requested that her supervisor be made aware of "his real job duties[,] which do[] not involve[] [a] supervisor making [an] employee[']s job a stressful place to work.  Surely I am not the illiterate one."  Grievance Report (doc. 23-13).

In addition, Campbell claims that she was subjected to a sexually hostile work environment because Greg Smith

> implied about maybe what I have on or I'm matching or what color
> you got on today or you keep your nails done or stuff like that. . . .
> Maybe he was referring to my headband or whenever I have my
> uniform on, I always, I guess, just match or the lipstick matching your
> scarf or, you know.

---

[4]According to interview notes maintained by Scott Castleberry, Anthony Smith, George Taylor, and Greg Smith all stated that Greg Smith only told other employees not to perform Campbell's job for her, but they could aid her. Interview Notes (doc. 23-14).

Campbell Dep., at 158-159.  Campbell filed a charge of discrimination with the

EEOC on April 25, 2008.  EEOC Charge (doc. 23-15).

May 30, 2008 EEOC Charge and the June 18, 2008 Amendment

Finally, Campbell's third EEOC charge and the amendment thereto cover

four separate instances of alleged discrimination.  A grievance report dated April

29, 2008, stated that Marlon Hill "humiliated" Campbell by asking her repeatedly

in front of coworkers if Campbell wanted to work overtime on April 28, 2009.[5]

Grievance Report (doc. 23-16); Campbell Dep., at 183.  She "went off on him"

and told Hill that "Yes means yes and no means no."  Campbell Dep., at 184.  In a

written statement about the incident, Hill stated that he had to ask her repeatedly

because Campbell's tone of voice and body language suggested she did not

actually want the shifts, and she had a history of not showing up for shifts for

which she volunteered.  Hill's Written Statement (doc. 23-17).  Campbell also

claims that on multiple occasions, Hill kept her from getting overtime shifts by

offering shifts that she requested to other people, but she cannot name any

employee who received a shift to which she was entitled.  Campbell Dep., at 194-

---

[5]During her meeting with Sloss management and union officials, Campbell
stated that Wesley Davis was given the overtime shift.  Interview Notes (doc. 23-
19).  However, during her deposition testimony, she stated that she worked the
shift.  Campbell Dep., at 187.

196.  Campbell noted that Hill was supposed to ask the person who was determined by company policy to be "due" for the shift.  Campbell Dep., at 190-191.

Also on April 28, 2009, Campbell asserts that Hill made "sexual gestures" toward her.  EEOC Charge (doc. 23-18).  When interviewed by Sloss management and union representatives about the sexual gestures, Campbell stated that she did not feel like talking about it, Interview Notes (doc. 23-19), but during her deposition, Campbell stated that the sexual gestures included Hill's comments that Campbell needed a man in her life, that he would take care of her, and that he would cut her grass.  Campbell Dep., at 188-190.

On June 2, 2008, John Belcher gave Campbell a written reprimand for not wearing her respirator in an area where such safety equipment was required.[6]  Campbell Dep., at 200-201; Record of Disciplinary Action (doc. 23-20).  At the

---

[6]When she was hired, Campbell was given a test regarding the use of the respirator and knew it was important for her protection and safety.  Campbell Dep., at 56-57.  It was necessary to wear uniforms and safety glasses  in the ovens department, in which lidmen worked, for safety purposes.  Campbell Dep., at 60-61.  She attended a safety class after being hired and received a copy of the Personal Protective Equipment booklet.  Campbell Dep., at 65-66.  She received a uniform, a respirator, glasses, and boots upon being hired.  Campbell Dep., at 66.  She had yearly training on the respirator.  Campbell Dep., at 68.  On December 12, 2005, Campbell initialed and signed a document indicating that she received safety literature on personal protective equipment and respirators, and that she had received a respirator fit test.  Ex. 7, Defendant's Evidentiary Material (doc. 23-7).

same time, Belcher gave a written reprimand to a male employee, Rayfield Irvin, for the same offense.  Campbell Dep., at 201.  Moreover, Campbell insists that she was informed by other workers that Belcher himself was not wearing his respirator and gave other employees the opportunity to put them on rather than receive disciplinary action.  Campbell Dep., at 202; Draft of Grievance Report (doc. 23-21).  She stated that she believes Belcher was retaliating against her because she called him a liar during a meeting with several union and management personnel.  Draft of Grievance Report (doc. 23-21).

On June 5, 2008, Campbell injured her lower left abdomen while on the job.  Campbell Dep., at 208.  As a result, Campbell was restricted from reaching and pulling, which precluded her from performing her duties as a lidman, so she asked Ken Lambert for light duty work to perform until she was medically cleared to work as a lidman.  Campbell Dep., at 209-212.  Campbell spent one day in the office and one-half of a day painting, after which Ken Lambert told her there was no more light duty work he could assign her.  Campbell Dep., at 212-213.  She does not know whether there was any more light work for Lambert to assign her.  Campbell Dep., at 213-214, 218.

<u>Denial of Promotions and Training Opportunities</u>

The plaintiff alleges two instances of not being properly trained before

being tested for various positions.  She claims that when she applied for a "PMF"

position in "slag wool" in September 2007, they did not take sufficient time to

adequately train her.   Campbell Dep., at 97-98.  She was tested on troubleshooting

"the machine" but the machine only ran for three days during her thirty-day

training period.  Campbell Dep., at 102-103.  The plaintiff also claims she was

discriminated against during her training for the "pump tender" position in mid-

December of 2007.  Campbell Dep., at 108-110.  During her thirty-day training

period, she was required to go back to the ovens for several days, so she requested

more time to train as pump tender.  Campbell Dep., at 110.  She claims other

employees were given more time to train, but she was not.  Campbell Dep., at 110-

125.  Campbell did not complain of this conduct to the union nor did she include

these instances of alleged discrimination in any EEOC complaint.

The plaintiff also claims she was treated differently while training for a

position identified as "door machine," a position for which she ultimately

qualified, in mid-December of 2008.  Campbell Dep., at 245-246, 255.  Campbell

claims that an employee, Douglas Whatley, told her that a supervisor named

Rodney Steeley said he would ensure that Campbell would not qualify for the

position by failing to give her adequate training.  Campbell Dep., at 236, 250.  She

also claims that Steeley threatened to write her up when she made a mistake and

that she was only given fourteen days, instead of thirty, to train.  Campbell Dep.,
at 246-247.

## Standard of Review

A moving party is entitled to summary judgment if there is no genuine issue
of material fact, leaving final judgment to be decided as a matter of law.  *See* FED.
R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
587, 106 S.Ct. 1348, 1355-56 (1986).  The facts, and any reasonable inference
therefrom, are to be viewed in the light most favorable to the non-moving party,
with any doubt resolved in the nonmovant's favor.  *See Adickes v. S.H. Kress &
Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970).  Once met by the moving
party, however, the burden shifts to the nonmovant to come forward with evidence
to establish each element essential to that party's case sufficient to sustain a jury
verdict.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552
(1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

A party opposing a properly submitted motion for summary judgment may
not rest upon mere allegations or denials of his pleadings, but must set forth
specific facts showing that there is a genuine issue for trial.  *Eberhardt v. Waters*,
901 F.2d 1578, 1580 (11th Cir. 1990).  In addition, the non-moving party's
evidence on rebuttal must be significantly probative and not based on mere

assertion or merely be colorable.  *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986).  Speculation does

not create a genuine issue of fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181

(11th Cir. 2005).

## Analysis

As an initial matter, summary judgment is due to be granted with respect to

plaintiff's discrimination claims related to her training for the PMF, pump tender,

or door machine positions.  A prerequisite to bringing a Title VII claim is the

filing of a timely charge with the EEOC.  *See* 42 U.S.C. § 2000e-5.  "A plaintiff's

judicial complaint is limited by the scope of the EEOC investigation which can

reasonably be expected to grow out of the charge of discrimination."  *Mullhall v.*

*Advance Sec., Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) (citing *Sanchez v.*

*Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970)).  "Courts have found that a

charge based on racial discrimination does not encompass all potential claims for

denial of promotions, pay raises, transfers, and overtime."  *Williams v. Hager*

*Hinge Co.*, 916 F. Supp. 1163, 1174 (M.D. Ala. 1995).

None of the employees who trained or tested the plaintiff for the PMF and

pump tender positions – "Brasher," "John Jennings," "Wayne Shaw," "CD," "Mr.

Bell," "Bland," "Fifty," or "Steeley," Campbell Dep., at 97, 100-101, 104, 109-

13

110, 246, 253 – were involved in any of the incidents described in Campbell's four EEOC complaints.  The training periods for the PMF and pump tender occurred in September and December 2007, but the plaintiff's next EEOC charge was not filed until April 25, 2008, and alleged only her suspension for missing a scheduled shift.  Moreover, she did not file a grievance or an EEOC charge or tell anyone in management about the alleged discriminatory conduct involving the PMF position, and she provides no evidence that she complained to anyone about her training for the pump tender position.  The events surrounding the door machine training occurred after the last EEOC charge, precluding the possibility that the EEOC investigations covered those occurrences.  Under these facts, the court finds as a matter of law that the EEOC investigation resulting from the filed charges would not cover the allegedly discriminatory training period.

Hostile Work Environment Claim

As for the other claims, Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Sex discrimination may be proven in one of two ways: through a tangible employment action, such as termination, or through "creation of a hostile work environment caused by sexual harassment that is sufficiently severe and pervasive to alter the terms and conditions of work.

*Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1300 (11th Cir.

2007).  To establish a sexual harassment claim based on a hostile work

environment, the plaintiff must show: (1) that she belongs to a protected group; (2)

that she was subjected to unwelcome sexual harassment; (3) that the harassment

was based on her sex; (4) that the harassment was so severe and pervasive that it

altered the terms and conditions of her employment; and (5) a basis for holding her

employer liable.  *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Without question, the plaintiff is a member of a protected group and she did

not welcome at least some of the alleged conduct of the multiple individuals whom

she claims sexually harassed her.  However, although the plaintiff claims many

instances of discrimination and harassment, many cannot be considered in her

hostile work environment claim because they are not sex or gender-based.

As the 11th Circuit has held in the past,

> we examine the statements and conduct complained of collectively to
> determine whether they were sufficiently pervasive or severe to
> constitute sexual harassment,[but] the statements and conduct must be
> of a sexual or gender-related nature-"sexual advances, requests for
> sexual favors, [or] conduct of a sexual nature,"-before they are
> considered in determining whether the severe or pervasive
> requirement is met.  Innocuous statements or conduct, or boorish ones
> that do not relate to the sex of the actor or of the offended party (the
> plaintiff), are not counted."

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (citations

omitted) (alteration in original) *abrogated on other grounds in Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  The court notes that even non-sexual conduct or statements that treat men and women unequally are barred by Title VII.  *See Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1503 (11th Cir. 1985) (stating that sexual harassment which creates a hostile or offensive environment for members of one sex "can be of at least two kinds: (1) a threatening, bellicose, demeaning, hostile or offensive conduct by a supervisor in the workplace because of the sex of the victim of such conduct; or (2) 'unwelcome sexual advances'").  However, because the alleged harassment must be based on sex, "the plaintiff must show that but for the fact of her sex, she would not have been the object of harassment."  *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).  "'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 372 (1993) (Ginsburg, J., concurring)).

In this case, the undisputed evidence shows that Campbell's April 1, 2008 suspension and June 2, 2008, written reprimand were not gender-related, nor was some of Greg Smith's treatment of the plaintiff.  The defendant produced evidence

16

that anyone who failed to show up for a shift or call-in to inform his supervisor that he would not make it was suspended.  Castleberry Dep., at 80-81.  Campbell claims that Albright, Chaney, and Taylor are male employees who failed to show up or report off but were not disciplined.  She relies, however, on inadmissible hearsay that will not be available in admissible form at trial, which is insufficient to overcome summary judgment.  *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996); *see Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir. 1996).  Further, when Campbell was reprimanded on June 2, 2008, for failing to wear a respirator, another male employee who was standing next to her and not wearing his respirator was written-up as well.  Accordingly, the evidence shows as a matter of law, Campbell was treated no differently than male coworkers.

With respect to how Greg Smith treated her, the plaintiff provides no evidence that Smith gave her heavier equipment because of her gender.  It was Campbell's responsibility to bring a pole with her to use in securing the lids on the ovens.  When she did not bring one with her, Smith would provide one that was sometimes heavier than the one she would select for herself.  Campbell has never seen Smith provide any other employee with a pole nor does she recall any lidman complain that Smith provided him or her with a heavy pole.  Accordingly, the April 1, 2008, and June 2, 2008, disciplinary measures and Smith's selection of

equipment for Campbell to use cannot be considered sex or gender-based.

The remaining allegations of sex-based discrimination are simply not severe and pervasive so as to allow this case to proceed to trial.  Title VII's prohibition on sex discrimination bars sexual harassment "only when the harassment alters the terms or conditions of employment." *Mendoza*, 195 F.3d at 1245.  Thus, the sexually discriminatory harassment must rise to a level that is so severe and pervasive that it alters the terms and conditions of employment. *Id.* It is this fourth element "that tests the mettle of most sexual harassment claims," *Gupta*, 212 F.3d at 583, and helps ensure that Title VII will avoid becoming a federal "civility code for the American workplace." *Oncale,* 523 U.S. at 80, 118 S.Ct. at 1002. Requiring that the plaintiff prove that the conduct is severe and pervasive "'filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing,'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2284 (1998), and "male-on-male horseplay or intersexual flirtation." *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003.

In determining whether conduct was so severe and pervasive as to alter the conditions of employment and create an abusive working environment, the court must consider the totality of the circumstances. *Mendoza*, 195 F.3d at 1246.

Thus, although Greg Smith would check-in with the plaintiff, saying he was "wondering where you are" and that Campbell "need[ed] to be getting up to go back to work" because the second horn was about to sound, the court must consider George Taylor's evidence that they would wait on Campbell "off and on" to get to her duty station. (doc. 23-14). Likewise, repeated questions about whether Campbell wanted to work an overtime shift must be viewed in tandem with Marlon Hill's statement that Campbell's tone and body language suggested she did not want the shift and the fact that she failed to show up for shifts for which she volunteered. (doc. 23-17).

Even coupled with Howard's alleged conduct that included spraying Campbell with the hose, pulling her jacket open, and saying, "Look here Kinney[,] her titties aren't big enough for a mouth full [sic]"; Greg Smith's alleged instructions to other employees not to help Campbell with her duties; one comment about Campbell's fingernails and lipstick matching her outfits; and one comment that she "needed a man" in her life are not sufficiently severe and pervasive.

To establish harassment sufficiently severe and pervasive to rise to the level of sex discrimination, the plaintiff must show that the defendant's conduct "create[s] an objectively hostile or abusive work environment–an environment that

19

a reasonable person would find hostile or abusive"–and the plaintiff must

"subjectively perceive the environment to be abusive . . . ."  *Harris v. Forklift Sys.,*

*Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 270 (1993).  The objective component of

this test is fact intensive.  *Mendoza*, 195 F.3d at 1246.  The Supreme Court has

provided guidance to the lower courts by announcing four non-exclusive factors to

consider when determining whether a reasonable person would find the work

environment hostile.  These factors include the frequency of the conduct; the

severity of the conduct; "whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and whether the conduct unreasonably

interferes with the employee's job performance."  *Allen v. Tyson Foods*, 121 F.3d

642, 647 (11th Cir. 1997) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371).

As to the first factor, the alleged discrimination did not occur over a long

period of time.  The first EEOC complaint was based on a single event on May 26,

2007.  EEOC Charge (doc. 23-10).  The plaintiff's second EEOC complaint notes

the alleged discrimination occurred between April 1, 2008, and April 23, 2008.

EEOC Charge (doc. 23-15).  Finally, the plaintiff's third EEOC complaint and the

amended complaint discuss alleged discrimination on April 28, 2008, June 2,

2008, and following her on-the-job injury on June 5, 2008.  EEOC Charges (docs.

23-18, 23-23).  Thus, the evidence shows that plaintiff was subjected to

discrimination on an isolated event on May 26, 2007, most but not all of April

2008, and twice in June 2008.  *See Latrece Lockett v. Choice Hotels Int'l*, 315 Fed.

Appx. 862, 866 (11th Cir. 2009) (alleged harassment that occurred for

approximately four months was not frequent); *Webb-Edwards v. Orange County*

*Sheriff's* Office, 525 F.3d 1013, 1027-28 (11th Cir. 2008) .

As to the second factor, the conduct alleged in this case is considerably less

severe than that which the Eleventh Circuit has repeatedly found insufficient to

establish a hostile work environment.  *See Latrece Lockett*, 315 Fed. Appx. at 863

(11th Cir. 2009) (holding that coworker's comment to plaintiff "that he would lick

her 'p-u-s-s-y,' that 'he would go down on [her] good,' that her boyfriend 'ain't

F'ing [her] right,' . . . and that she needed 'to get with a real guy'" and coworker's

touching plaintiff's buttocks does not constitute severe and pervasive conduct);

*Mitchell v. Pope,*189 Fed. Appx. 911, 913-14 & n. 3 (11th Cir. 2006) (affirming

summary judgment for employer where the employee alleged her supervisor made

sexually overt statements, such as "your ass sure does look fine" and "you can just

walk into the room and I'd get an erection," and engaged in conduct, such as

trying to kiss her, lifting her over his head, rubbing up against her and reaching

across her chest, turning out the bathroom lights while she was inside, and

simulating "humping" another female); *Webb-Edwards*, 525 F.3d at 1027-28

(finding that supervisor's comments that plaintiff would "be better if she'd wear tighter clothes," "looked hot," and would get time off if she wore tighter clothes – which persisted at least weekly for eight weeks – and a comment to plaintiff's husband that the supervisor was "eating [his] wife" were not severe and pervasive); *Dar Dar v. Associated Outdoor Club, Inc.*, 248 Fed. Appx. 82, 85 (11th Cir. 2007) (finding co-workers touching plaintiff on the buttocks twice, asking plaintiff if she wore panties with a "built-in butt," and telling plaintiff about co-worker's "whale of a dick" was not severe or pervasive) *cert. denied*, 128 S.Ct. 2444 (2008); *see also Mendoza*, 195 F.3d at 1246-47 (citing thirteen cases from other circuits where abhorrent conduct that, although sexually charged, does not amount to sexual harassment under Title VII).  Just as the conduct in the cited cases does not alter the terms and conditions of employment, the conduct at issue in this case fails to as well.[7]

Third, only Howard's alleged conduct was physically threatening, and the other alleged conduct was not sufficiently offensive or humiliating.  In *Latrece Lockett*, the Eleventh Circuit affirmed summary judgment in favor of the defendant-employer, noting that the defendant's conduct was not physically

---

[7]The plaintiff cited no cases that demonstrate the alleged conduct Campbell was subjected to was severe and pervasive.

threatening or humiliating, or severe and pervasive, where a coworker of the plaintiff told her "that he would lick her 'p-u-s-s-y,' that 'he would go down on [her] good,' that her boyfriend 'ain't F'ing [her] right,' . . . and that she needed 'to get with a real guy.'" The coworker had also referred to the plaintiff as a "ho" and a "bitch," and "'jumped in [the plaintiff's] face and acted like he was going to hit [the plaintiff].'" *See Latrece Lockett*, 315 Fed.Appx. at 864, 866.  The alleged conduct of Sloss employees was significantly less crude and offensive than those in *Latrece Lockett*, and Howard's interaction with Campbell was no more threatening than that involved in *Latrece Lockett*.  Indeed, the plaintiff rebuffed Howard, stating that she would beat him "black and blue."

Fourth, the plaintiff presented no evidence that her job performance suffered in any way.

Having tested this claim's "mettle" and being satisfied that it fails to meet the severe and pervasive standard as a matter of law, *Gupta*, 212 F.3d at 583, summary judgment is due to be granted in favor of Sloss on the sexual harassment claim.

Retaliation

Campbell asserts that her April 2008 suspension, April 2008 verbal warning, June 2008 written warning, the failure to assign her overtime, and the failure to

give her light duty work were in retaliation for protected activity in which she engaged.  To prove a retaliation claim, the plaintiff must show (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is some causal connection between the two events.  *Olmstead v. Taco Bell Corp*. 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *Meeks v. Computer Assc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  If the plaintiff establishes a prima facie case, the defendant may present legitimate, non-retaliatory reasons for the adverse employment action.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (citations omitted).  "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  *Id.* (citation omitted).

Campbell engaged in statutorily protected conduct each time she filed an EEOC charge or a union grievance.  However, Campbell cannot show she suffered an adverse employment action by not receiving overtime or light duty work.  An adverse employment action must produce injury or harm and must be materially adverse.  *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. at 67-68.  Campbell testified during her deposition that she could not identify anyone who received an overtime shift to which she was entitled, nor could she refute her supervisor's statement that there was no light duty work available for her.  Accordingly, no

evidence in the record suggests the plaintiff suffered a materially adverse injury by not receiving overtime or light duty work.

Moreover, no evidence shows Ken Lambert, who issued the April 2008 suspension, or John Belcher, who issued the June 2008 written reprimand, knew of Campbell's engagement in any protected activity except for her grieving the May 26, 2007, event involving Howard.  Campbell Dep., at 87; Castleberry Dep., at 74-76.  Only speculation and inadmissible hearsay suggest Greg Smith, who issued a verbal reprimand to Campbell in April 2008, knew that Campbell engaged in protected activity.  Campbell Dep., at 137-138 ("I feel that he knows [sic] [that she filed an EEOC charge]. . . .  it's just that he knew.  I feel like he knew. . . .  He never said anything to me about filing."); 139-140 ("[An employee identified as 'Griffin' made it aware to me that Greg Smith knew about the sexual harassment charge against Howard because they was [sic] kind of close" during a conversation they had "a long time ago.").  Speculation does not create a genuine issue of material fact so as to defeat a summary judgment, *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11ᵗʰ Cir. 2005), and as discussed earlier, inadmissible hearsay that cannot be reduced to admissible form for trial cannot defeat summary judgment. *McMillian*, 88 F.3d at 1584; *see Pritchard*, 92 F.3d at 1135.

As for the alleged retaliation by Lambert, Belcher, and Smith, "[a] decision

maker cannot have been motivated to retaliate by something unknown to him."

*Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir.

2000).  To the extent Lambert, Belcher, and Smith did not know of the plaintiff's

grievances or EEOC charges, they could not have retaliated against her for making

such grievances and charges.  Although Lambert and Belcher knew of the June 20,

2007, EEOC charge, Lambert's discipline of Campbell did not occur until April 1,

2008, and Belcher's discipline of her did not occur until June 2, 2008.

      "The burden of causation can be met by showing close temporal proximity

between the statutorily protected activity and the adverse employment action."

*Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing

*Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000)).

While the Eleventh Circuit has found that  a gap of three and one-half months

between the protected activity and employment action fails to show causation, *see*

*Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006), a period of seven weeks has

been sufficiently close to prove causation.  *Farley v. Nationwide Mutual Ins. Co.*,

197 F.3d 1322, 1337 (11th Cir. 1999).  In this case, the more than eight month gap

between the EEOC charge and Lambert's discipline and ten month gap between the

charge and Belcher's discipline is insufficient to show causation.

      Lastly, the claims for retaliation involving Lambert's April 2008 suspension

26

of Campbell and Belcher's June 2008 written warning to Campbell fail for the additional reason that her supervisors had legitimate, non-retaliatory reasons for the discipline.  It is undisputed that Campbell did not show up for a shift nor did she report off, and pursuant to the collective bargaining agreement between the union and Sloss, such a failure results in discipline.  During Castleberry's tenure as General Manager, such discipline had been a three-day suspension.  Moreover, Campbell received safety materials requiring that employees wear their respirators.  When Campbell and a coworker failed to follow this rule, they were each disciplined.  Such violations of company policies and procedures constituted legitimate, non-discriminatory reasons to discipline Campbell.

## CONCLUSION

Having considered the foregoing, and finding that plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial on her claims against defendant, and that defendant Sloss Industries is entitled to judgment as a matter of law, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED**.  Plaintiff's claims shall be **DISMISSED WITH PREJUDICE** by separate order.

**DONE** and **ORDERED** this 22nd day of July 2010.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE